# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **CLARK DEMETRO, Union County, New Jersey, and CLARK & SONS CONSTRUCTION, LLC, Union County, New Jersey,**<br><br>    **Plaintiffs,**<br><br>**v.**<br><br>**NATIONAL ASSOCIATION OF BUNCO INVESTIGATIONS, Baltimore County, Maryland, and ROBERT POCHEK, individual capacity, Middlesex County, New Jersey, and TOWNSHIP OF WOODBRIDGE, NEW JERSEY, and JOHN DOE,**<br><br>    **Defendants.** | Civ. No. 14-6521 (KM) (SCM)<br><br>**OPINION** |

## KEVIN MCNULTY, U.S.D.J.:

  The plaintiffs, Clark Demetro ("Demetro") and Clark & Sons Construction, LLC ("Clark & Sons") brought this action against Defendants National Association of Bunco Investigators ("NABI"),[1] Robert Pochek ("Pochek"), and the Township of Woodbridge, NJ, ("Woodbridge") based on allegedly defamatory statements and violations of Demetro's rights under the constitutions and laws of the United States and New Jersey. In short, Demetro asserts that NABI has targeted and defamed him due to his Romani ethnicity

---

[1] NABI was incorrectly pled as the "National Association of Bunco *Investigations*." "Bunco" is an informal term, perhaps antiquated, for a swindle or confidence trick.

by cataloguing him in its online database and sharing allegedly unsubstantiated accusations of criminal conduct.

After my dismissal of some of plaintiff's claims (DE 61, 62), the remaining causes of action are as follows: (i) common law defamation (Count 1); (ii) violation of plaintiff's right to equal protection of the law under 42 U.S.C. § 1983 and the New Jersey Civil Rights Act ("NJCRA"), N.J. Stat. Ann. § 10:6–1 *et seq.* (Count 5); (iii) violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5-12(f) based on discrimination in a place of public accommodation (Count 6); and (iv) civil conspiracy to violate plaintiff's right to equal protection of the law under 42 U.S.C. § 1985 and the NJLAD (Count 7).

Theories of defamation and selective prosecution I must reject for lack of evidence. The website, fairly read, reported that Demetro had been criminally charged, which is a true statement and therefore not defamatory. The record also demonstrates that the website did not catalyze any discriminatory prosecution or official mistreatment of Demetro, who was charged locally based on an independent civilian complaint.

Equal protection claims, however, remain in play. There is evidence from which a fact finder need not, but could, conclude that information was published on this website on a discriminatory basis. Some of the language on this website is appalling, and the citizens have a right to expect better of the police.

I say "the police" because the members in question are police officers. They do not necessarily lose that status because they are acting under the auspices of an antifraud organization, which occupies a sort of queasy middle status between official and unofficial.

I say "appalling" because the website at times speaks in broad ethnic categories, attributing fraudulent practices and motives to the Romani people generally (who are referred to as "gypsies," a charged and at least potentially derogatory term). Of course law enforcement may, when appropriate, use race

2

or ethnicity (or height, or weight, or eye color) to identify suspects. Of course law enforcement may focus its attention on gangs or criminal organizations that associate along ethnic lines. And of course this court does not sit as a general arbiter of the language on websites. But police-published statements attributing criminality to ethnic groups—as opposed to factual statements about particular persons or criminal organizations—can undermine public confidence that the laws are being administered fairly.

Now before the Court are NABI's motion for summary judgment (DE 83), and the motion of Pochek and Woodbridge for summary judgment (DE 84), pursuant to Fed. R. Civ. P. 56. For the reasons stated in this Opinion, the motions are denied in part and granted in part. Defendants' motions for summary judgment are granted as to the defamation claim (Count 1) and the NJLAD claim for discrimination in a place of public accommodation (Count 6). Defendants' motions are denied as to the equal protection claims, both the direct claim under 42 U.S.C. § 1983 and the NJCRA (Count 5) and the conspiracy claim under 42 U.S.C. § 1985 (Count 7).

## I.    BACKGROUND[2]

---

[2]    Record items cited repeatedly will be abbreviated as follows. Citations to page numbers refer to the page numbers assigned through the Electronic Court Filing system, unless otherwise indicated.

| | |
|---|---|
| "DE _" = | Docket Entry in this case |
| "NABI Br." = | Memorandum of Law in Support of Defendant NABI's Motion for Summary Judgment (DE 83-3) |
| "NABI SMUF" = | NABI's Statement of Material Undisputed Facts (DE 83-2) |
| "RP/W Br." = | Memorandum of Law in Support of Defendants' Robert Pochek and the Township of Woodbridge Motion for Summary Judgment (DE 84-3) |
| "RP/W SMUF" = | Robert Pochek and Township of Woodbridge Statement of Material Undisputed Facts (DE 84-2) |
| "Pl. Opp. to NABI" = | Plaintiffs' Memorandum of Law in Opposition to NABI's Motion for Summary Judgment (DE 90) |
| "Pl. SMUF re NABI" = | Plaintiffs' Statement of Material Undisputed Facts in Response to NABI's SMUF (DE 90-3, ending at p. 10) |

## A. Factual Background

### i. The Parties

Plaintiff Clark Demetro is a man of Romani ethnic descent who resides in Elizabeth, New Jersey.[3] (DE 97 ¶ 1; DE 83-10 at 4; Pl. CS ¶ 1). The Romani people (also referred to as "Roma" or "Rom") are a distinct ethnic group originally of Asian origin. Historically and colloquially they have been described with the epithet "Gypsy," which can carry a derogatory connotation. (DE 21 at pp.4-5, ¶¶ 1,5). The Roma have historically suffered from discrimination based on their origin and an assumed connection with criminality. (*Id.*).

Demetro was engaged in the business of home renovations through his company, Clark & Sons, which was incorporated in New Jersey in 2013 and has since discontinued operations. (DE 97 ¶ 2; DE 83-10 at 9, 15; RP/W SMUF ¶ 31; Pl. SMUF re RP/W ¶ 31). Clark & Sons advertised in "Home Magazine" and similar publications in New Jersey, on craigslist.com, and in flyers handed out by Demetro. (RP/W SMUF ¶¶ 33-35; Pl. SMUF re RP/W ¶¶ 33-35). Demetro did not maintain any business records for Clark & Sons. (RP/W SMUF ¶ 37; Pl. SMUF re RP/W ¶ 37). He could only remember the names and addresses for two of the customers that Clark & Sons serviced. (RP/W SMUF ¶ 38; Pl. SMUF re RP/W ¶ 38).

---

| | |
|---|---|
| "Pl. CS" = | Plaintiff's Counter Statement of Material Undisputed Facts (DE 90-3, starting at p. 10) |
| "Pl. Opp. to RP/W" = | Plaintiffs' Memorandum of Law in Opposition to NABI's Motion for Summary Judgment (DE 92) |
| "Pl. SMUF re RP/W" = | Plaintiffs' Statement of Material Undisputed Facts in Response to Robert Pocket's and Township of Woodbridge's SMUF (DE 92-2) |
| "DE 97" = | NABI's Response to Plaintiffs' Counter Statement of Undisputed Material Facts (DE 97) |
| "DE 99-1" = | Robert Pochek and Township of Woodbridge Reply Statement of Material Undisputed Facts (DE 99-1) |

[3]  At various points throughout the record plaintiff Clark Demetro is referred to as Clark Signo. (*See, e.g.*, DE 83-15; RP/W SMUF ¶¶ 5-6; Pl. SMUF re RP/W ¶¶ 5-6). Throughout this Opinion, I will refer to the plaintiff as Demetro.

NABI is a non-profit organization that provides information to its members about suspected fraudulent activity involving 'transient' criminals. (NABI SMUF ¶ 2; Pl. SMUF re NABI ¶ 4; RP/W SMUF ¶ 39; Pl. SMUF re RP/W ¶ 39). NABI's members include law enforcement personnel and individuals employed in related fields who are involved in the detection and prosecution of criminal conduct, and the apprehension of defendants. (NABI SMUF ¶ 3).[4] It compiles and distributes materials regarding recent developments in fraud related crimes through electronic newsletters and bulletins. (NABI SMUF ¶ 4).

NABI has a history of publishing articles that include racially charged generalizations about persons of Romani descent. (Pl. CS ¶¶ 23-24; DE 97 ¶¶ 23-24). For example, the following are excerpts from articles or text that appeared on NABI's website:

> "We've all heard tales about gypsies and their mysterious ways, though there's a good chance, many of those stories aren't true. But these people really do exist. . . . Their faces look like anybody else's here, but police say these individuals, all Romanian citizens,[5] are a modern take on notorious gypsies of old. . . . They'll look for checkbooks, jewelry. . . anything that they think they can convert to money." (DE 90-1 at 31).

> "Ignorance is the Gypsies' weapon against the outside world." (DE 90-1 at 40).

(Pl. CS ¶¶ 23-24; DE 97 ¶¶ 23-24).

Some of the NABI website postings include disclaimers of discrimination. For example, an article reporting on NABI's 2006 annual conference notes one speaker's generous concession that "[n]ot all Gypsies or Rom are criminals." (DE 90-1 at 37). Nonetheless, the participants' statements then largely cast

---

[4]     On several occasions the parties' responses to the other parties' Local 56.1 statement of undisputed material facts are not directly responsive. (*Compare* NABI SMUF ¶¶ 3, 4, *with* Pl. SMUF re NABI ¶¶ 1-7; Pl. CS ¶¶ 23-24; DE 97 ¶¶ 23-24). For example, the allegations regarding the ethnic comments are not denied outright, but "denied as irrelevant." That is not an option under the Local Rules. Pursuant to Fed. R. Civ. P. 56(e), the Court may consider a fact undisputed for purposes of a summary judgment motion if a party "fails to properly address another party's assertion of fact."

[5]     This statement is confusing, and possibly confused. "Romanian citizens" would most commonly refer to people who are citizens of the nation of Romania.

such caution aside: the speaker goes on to explain that NABI's "main target was the thefts, swindles and frauds perpetrated by Gypsies." (*Id.*). The article also quotes a detective who presented at a NABI conference as follows:

> In his presentation, Det. Gary Nolte of Skokie showed a painting of wagons passing through a bucolic countryside. "Most of America thinks this is what a Gypsy is, I kid you not," Nolte said. Americans "think it's fun. They think it's a joke. Tambourine-thumping, banjo-playing buffoons. That's what [Gypsies] want us to think. But they're not."

(*Id.*). The article again quotes Nolte: "The Gypsies, Nolte said, 'have a common goal, and that's to get over on us. They're going to steal from the *gaje* [the non-Gypsy] every day of their life.'" (*Id.*). The remainder of the account of the NABI conference contains many other such descriptions, all pertaining to "Gypsies" (or suspected "Gypsies").

The reporter who wrote the article also obtained the comments of a university scholar (not a guest at the conference, apparently) who pointed out that the NABI officers' attitudes "are especially egregious because of the long history of persecution of Gypsies." (*Id.*).

NABI's database has included photographs of individuals recently arrested or suspected of criminal activity. (DE 90-1 at 23, 25, 43-47; Pl. CS ¶¶ 14, 15, 23, 24; DE 97 ¶¶ 14, 15, 23, 24). Beneath those headshots, NABI includes details about the individuals such as their height, weight, hair color, eye color, potential aliases, and a brief summary about their alleged misconduct. (*Id.*). Next to some of these individuals' names appears a notation "G/M" or "G/F", which perhaps stands for "Gypsy/Male" and "Gypsy/Female", although the parties have not explicitly said so. (*Id.*). Out of the sample provided to the Court, most of the images have either "G/M" or "G/F" next to the name, while a few names have "W/M" or "W/F", which ostensibly means "White/Male" and "White/Female." (*Id.*).[6]

---

[6]    The intended meaning, again, is unclear, and may reflect racial or ethnic confusion.

6

Demetro appears in two NABI posts that have "G/M" next to his name and image. (DE 90-1 at 23, 25; Pl. CS ¶¶ 9, 14, 15; DE 97 ¶¶ 9, 14, 15). One of those posts, from April 12, 2002, includes a description of Demetro selling a watercraft at a pawnshop in Philadelphia. (DE 90-1 at 23). It also says that "Demetro has an extensive record for Assaulting Police and Resisting Arrest when police are called to domestic situations involving him." (*Id.*). "G/M" is directly next to his name. (*Id.*). The second post is from March 30, 2012, and also has "G/M" directly next to his name. (DE 90-1 at 25). This post describes a Georgia traffic stop in which Demetro was found to possess $20,000 in cash. It also says that "Demetro is involved in several scams involving Auto body work and Psychic readings." (Id.). Demetro appears in a third NABI post from May 2014, which is discussed in further detail below, *see* subsection I.A.ii, although that third post does not refer to Demetro's ethnicity. (DE 90-1 at 6).[7]

Access to the portion of NABI's website that includes information about fraud suspects is restricted to NABI's members. This section requires a username and password to log in. (NABI SMUF ¶ 12). NABI has two classes of membership with separate privileges: law enforcement ("LE") members and associate members. (NABI SMUF ¶ 7; Pl. SMUF re NABI ¶ 7).

To qualify for LE membership, applicants must submit proof that they are sworn law enforcement officers or certified by their agency to access federal, state, and local databases involving criminals, suspects, and arrestees. (NABI SMUF ¶ 8; Pl. SMUF re NABI ¶ 8). According to NABI, only LE members receive NABI materials with private and sensitive information, such as a suspect's social security number, birthdate, or FBI number. (NABI SMUF ¶ 9).

Associate members of NABI, who are generally in the fields of loss prevention, insurance, banking, or bail bonds, receive NABI materials with

---

[7]    Demetro initially brought defamation claims for all three of these NABI posts. In a prior Opinion, I dismissed the defamation claims for the 2002 and 2012 posts as untimely. (See DE 61, 62). However, the 2002 and 2012 posts may have evidentiary relevance.

redacted personally identifiable information ("PII") and do not have access to the unredacted materials available to LE members. (NABI SMUF ¶¶ 10, 11). The general public does not have access to the redacted or unredacted information accessible by associate members or LE members, as the website requires login credentials to view that material. (RP/W SMUF ¶ 50; Pl. SMUF re RP/W ¶ 50).

Under NABI rules, LE members are not permitted to disclose information found on the unredacted version of the online database or bulletins outside of authorized LE channels. (RP/W SMUF ¶ 51; Pl. SMUF re RP/W ¶ 51). It is not entirely clear how this rule is enforced and whether NABI has any actual restrictions that prevent LE members from sharing the unredacted information with unauthorized third parties. (*Id.*).

Demetro disputes the assertion that only NABI members can access the materials about fraud suspects on its website because he, although not a member, possesses copies of NABI's online materials that disclose his PII. (Pl. SMUF re NABI ¶ 9). During the course of discovery, however, Demetro has refused to explain with particularity how he obtained the NABI posts that would otherwise only be accessible to its members. *See* Subsection I.A.iii, *infra*.

NABI itself has no authority to arrest or prosecute any criminal suspect. (NABI SMUF ¶ 15; Pl. SMUF re NABI ¶ 15). LE members who perform their LE duties do so pursuant to their LE roles and not on behalf of NABI. (NABI SMUF ¶ 16; Pl. SMUF re NABI ¶ 16).

Defendant Woodbridge is a municipality organized under N.J. Stat. Ann. 40A:61-1. (RP/W SMUF ¶ 52; Pl. SMUF re RP/W ¶ 52). Woodbridge has a police department (the "Woodbridge PD") (*Id.*).

Defendant Pochek is a police officer who has been employed with the Woodbridge PD since 1995. (RP/W SMUF ¶ 54; Pl. SMUF re RP/W ¶ 54). Pochek became a LE member of NABI in 2004 and has served on NABI's Board of Directors intermittently from 2007 through the present. (RP/W SMUF ¶ 55; Pl. SMUF re RP/W ¶ 55; Pl. CS ¶ 13; DE 97 ¶ 13). Pochek served as NABI's

Executive Secretary from 2009 through 2014. (*Id.*). Pochek's employer was aware of his activities with and membership in NABI. (Pl. CS ¶ 21; DE 97 ¶ 21).

Demetro has been arrested on 26 separate occasions, including the "Del Rosso Incident" outlined below. (NABI SMUF ¶ 19; Pl. SMUF re NABI ¶ 19). None of those arrests involved officers who were working on behalf of NABI. (NABI SMUF ¶ 17; Pl. SMUF re NABI ¶ 17). At least three of those arrests resulted in criminal convictions for fraud or forgery-related offenses. (NABI SMUF ¶ 20; Pl. SMUF re NABI ¶ 20). Defendants attach various documents that describe some of those arrests. (*See* NABI SMUF ¶¶ 21-23, 25; Pl. SMUF re NABI ¶¶ 21-23, 25).

### ii. The Del Rosso Incident

On April 25, 2014, Michael Del Rosso ("Del Rosso") filed an official incident report with the Woodbridge PD against Demetro alleging that Demetro and his company had committed theft by deception. (NABI SMUF ¶ 35; Pl. SMUF re NABI ¶ 35). On May 16, 2014, Detective Andrew Kondracki of the Woodbridge PD interviewed Del Rosso about the basis for the incident report. (NABI SMUF ¶ 36; Pl. SMUF re NABI ¶ 36).

As alleged in Del Rosso's statement to Det. Kondracki, Del Rosso's mother's driveway needed repair work, so he contacted Clark & Sons around March 31, 2014, which his mother learned of from an advertisement in a local flyer. (NABI SMUF ¶ 37; Pl. SMUF re NABI ¶ 37). After "slicing" the concrete on the driveway, Demetro determined that the project would cost $7,500. (NABI SMUF ¶ 38; Pl. SMUF re NABI ¶ 38). Del Rosso then signed an agreement with Clark & Sons to complete the work for $7,500. (NABI SMUF ¶ 39; Pl. SMUF re NABI ¶ 39). Del Rosso paid Demetro an initial deposit of $4,350. (*Id.*).

According to what Del Rosso told the Woodbridge PD, Demetro never began work on the project, but instead returned two days later and claimed that he needed more money. (NABI SMUF ¶ 40). Del Rosso agreed to enter into another contract with Clark & Sons to also do some work on the house's gutters and gave Del Rosso an additional check of $600 for the gutter repairs.

(*Id.* ¶ 41; RP/W SMUF ¶ 74; Pl. SMUF re RP/W ¶ 74). Clark & Sons did repair Del Rosso's mother's gutters, but the work was allegedly done so poorly that Del Rosso had to hire another contractor to properly repair it. (NABI SMUF ¶ 42). With respect to the driveway, Demetro told Del Rosso that Clark & Sons could no longer complete the renovations for the $7,500 to which Del Rosso had initially agreed but instead required another $3,000 to complete the job. (*Id.* ¶ 43).

At this point, Demetro told Del Rosso that Del Rosso would lose the entirety of his deposit if he did not provide the additional $3,000. (*Id.*). Del Rosso decided to give Sons & Clark a check for $2,000, but after having second thoughts, Del Rosso cancelled the check before anyone cashed or deposited it. (DE 83-15 at 3). Then, on April 13, 2014, Demetro showed up in person at the house and demanded more money from Del Rosso. (*Id.*). Motivated by the concern that he would lose the money he already put down as a deposit, Del Rosso withdrew $2,000 in cash from his bank and gave it to Demetro. (*Id.*; RP/W SMUF ¶ 83; Pl. SMUF re RP/W ¶ 83; NABI SMUF ¶ 42).

This brought the total that Del Rosso gave Demetro / Clark & Sons to $6,950. (DE 83-15 at 2). Driven by the large sums of money Demetro demanded upfront without performing more work on the driveway, around April 22, 2014 Del Rosso researched Clark & Sons online and found numerous complaints about the company, seemingly suspicious details about Demetro doing business under different names (such as Clark Signo), and details about one of his arrests in Florida. (NABI SMUF ¶ 45; DE 83-15 at 3; RP/W SMUF ¶¶ 84-86, 99; Pl. SMUF re RP/W ¶¶ 84-86, 99).

Del Rosso approached Demetro about the information he discovered from his online research but Demetro denied the accusations. (NABI SMUF ¶ 45; DE 83-15 at 3). Del Rosso never stated that the information he found online was from NABI's website. (RP/W SMUF ¶ 87; Pl. SMUF re RP/W ¶ 87).

After providing the $2,000 in cash to Demetro, Del Rosso had trouble getting in contact with Demetro. (*Id.*). When they finally did speak, Del Rosso

informed Demetro that he wanted back the money he put down as a deposit. (*Id.*). Demetro did not return the money and Clark & Sons did not do any additional repair work for Del Rosso on the driveway or otherwise. (*Id.*).

Del Rosso then filed the April 25, 2014 incident report with the Woodbridge PD describing these allegations. (NABI SMUF ¶ 35; Pl. SMUF re NABI ¶ 35). As a result of this incident report, several arrest warrants were issued for Demetro, and Woodbridge PD officers attempted to locate him. (NABI SMUF ¶ 46; Pl. SMUF re NABI ¶ 46).

On May 27, 2014, Demetro was arrested by the Woodbridge PD as a consequence of the Del Grosso Incident. (RP/W SMUF ¶ 104; Pl. SMUF re RP/W ¶ 104). On November 20, 2014, Demetro was indicted on several criminal counts, which included charges for theft by deception and violations of the Contractor Registration Act, N.J. Stat. Ann. 56:8-136, *et seq.* (NABI SMUF ¶ 49; Pl. SMUF re NABI ¶ 49; RP/W SMUF ¶ 105; Pl. SMUF re RP/W ¶ 105).

On January 7, 2015, Demetro pled guilty to one count of Failure to Display Registration Number, N.J. Stat. Ann. 56:8-144 (RP/W SMUF ¶ 106; Pl. SMUF re RP/W ¶ 106). On March 6, 2015, Demetro was sentenced to one year of probation and was ordered to pay restitution to Del Rosso in the amount of $6,350—only $600 less than the total amount Del Rosso paid to Clark & Sons, seemingly taking into account the work performed on the gutters. (*Id.*; DE 83-16 at 4).

### iii. Online Posts About Demetro

On May 22, 2014, six days after Det. Kondracki interviewed Del Rosso, and while detectives from the Woodbridge PD were actively attempting to locate Demetro, Pochek posted information on NABI's website (the "May 22 Post"). The May 22 Post stated that Demetro used Clark & Sons "to scam victims into paying for work that is never performed" and was "wanted for Theft by Deception among other offenses." (DE 90-1 at pp. 5-7; NABI SMUF ¶¶ 34, 50; Pl. SMUF re NABI ¶¶ 34, 50; Pl. CS ¶ 3; DE 97 ¶ 3; RP/W SMUF ¶ 95; Pl. SMUF re RP/W ¶ 95). The May 22 Post shows two photos of Demetro, lists his

social security number, date of birth, height, address, driver's license number, and his arrest warrant number. (DE 90-1 at pp. 5-7). Pochek derived this information from the complaint that charged Demetro with Theft by Deception and violations of the Contractor Registration Act. (RP/W SMUF ¶ 96; Pl. SMUF re RP/W ¶ 96).

On May 30, 2014 Pochek updated the entry about Demetro on NABI's website, explaining that Demetro was arrested by the Woodbridge PD, processed, and released after posting bail (the "May 30 Update"). (*Id.*). Pochek noted that the case was deemed "closed pending [a] court hearing." (*Id.*). Like the May 22 Post, the May 30 Update was only posted on the secure portion of NABI's website accessible only to LE and associate members. (RP/W SMUF ¶ 95; Pl. SMUF re RP/W ¶ 95).

Nowhere in the May 22 Post or the May 30 Update is Demetro identified as Romani or a "Gypsy." (RP/W SMUF ¶ 98; Pl. SMUF re RP/W ¶ 98). There is no mention of Demetro's racial or ethnic background at all in those posts. (*Id.*).

Demetro does not describe in detail how he obtained copies of NABI's online materials about him, which are ordinarily only accessible to NABI members. Demetro claimed that a law enforcement officer—whose name he could not recall during his deposition—showed him the content. (DE 83-10 at 43; RP/W SMUF ¶ 100; Pl. SMUF re RP/W ¶ 100). Demetro could not remember which police department this unnamed officer worked for, but could recall that the officer was no longer on the force. (DE 83-10 at 43). Ultimately, Demetro has refused to disclose this officer's name during the course of discovery. (RP/W SMUF ¶ 101; Pl. SMUF re RP/W ¶ 101) Demetro was evasive when questioned about the details of how the unnamed officer procured this information and shared it with him. (*See* DE 83-10 at pp. 43-44).

At some point prior to the Del Rosso Incident, Demetro had searched his own name online and found unsavory descriptions of his prior business dealings and encounters with the criminal justice system. (RP/W SMUF ¶¶ 57-59; Pl. SMUF re RP/W ¶¶ 57-59).

On March 22, 2014, nine days prior to Demetro's initial contact with Del Rosso, a former Clark & Sons customer, Lynn Solomon, complained about her engagement with Clark & Sons on a website called ripoffreport.com. (RP/W SMUF ¶ 60; Pl. SMUF re RP/W ¶ 60). Solomon alleged in her post that Demetro performed substandard work, tried to get paid before the project was completed, walked off the job when she would not pay in advance of completion, and left a "major mess." (Id.; NABI SMUF ¶¶ 32-33; Pl. SMUF re NABI ¶¶ 32-33). On April 15, 2014, Solomon updated her previous post on ripoffreport.com to explain how Demetro had been arrested in Florida under a different name and that he had been using a separate name in New Jersey. (RP/W SMUF ¶ 61; Pl. SMUF re RP/W ¶ 61).

### B. Procedural Background

About three years prior to the commencement of this action, Demetro was involved in another federal lawsuit against NABI that made claims similar to those asserted in this case. See Demetro v. Police Dep't, City of Cherry Hill, N.J., No. 11-cv-4377 (JLL), 2011 WL 5873063 (D.N.J. Nov. 22, 2011). In that case, Demetro was part of a group of plaintiffs suing NABI and various police departments and officers based on alleged constitutional violations due to the plaintiffs' Romani ethnic background. See id., 11-cv-4377 at DE 18.

While named as a defendant, NABI was never served in that action and did not otherwise appear. Demetro, 2011 WL 5873063, at *3 ("[T]here is no indication on the Court's docket that service of process on NABI has been properly effectuated, and NABI has not filed a responsive pleading or joined in the motions to dismiss currently pending before the Court."). Ultimately, the plaintiffs in that case stipulated to its dismissal without prejudice in August 2012 without NABI ever having appeared or been served. See id., No. 11-cv-4377 at DE 42.

On October 21, 2014, Demetro and Clark & Sons filed their original complaint in this action. (DE 1). On November 24, 2015, Plaintiffs filed an amended complaint. (DE 21). On January 6, 2017, NABI filed a motion to

13

dismiss all claims for lack of personal jurisdiction and for failure to state a claim. (DE 47). In an Opinion and Order dated September 7, 2017, I granted in part and denied in part NABI's motion to dismiss the amended complaint, dismissing some of the claims and allowing others to proceed. (DE 61, 62). *Demetro v. Nat'l Ass'n of Bunco Investigations*, No. 14-6521, 2017 WL 3923290, at *1 (D.N.J. Sept. 7, 2017) ("MTD Opinion").

Specifically, I granted the motion to dismiss with respect to the following claims: Count 2 for commercial disparagement because plaintiffs failed to plead special damages; Counts 3 and 4 for defamation and false light because the claims were untimely; and Counts 5 and 7 for violations of 42 U.S.C. § 1983 and the NJCRA only insofar as they asserted claims based on reputational stigma alone. Counts 5 and 7 survive, however, insofar as they assert equal protection claims. (DE 61, 62). *See Demetro v. Nat'l Ass'n of Bunco Investigations*, No. 14-6521, 2017 WL 3923290 (D.N.J. Sept. 7, 2017). Additionally, I denied the motion to dismiss with respect to Count 1, a timely claim for defamation, and Count 6, a claim for public accommodation discrimination under the NJLAD, both of which remain. *Id.*

The September 7, 2017 dismissals were without prejudice to the filing of a motion for leave to amend the complaint within 30 days. (DE 61, 62). There having been no motion to amend, those dismissals have ripened into dismissals with prejudice. (DE 62, 66, 75, 81).

Now before the Court are the motion of NABI (DE 83) and the motion of Pochek and Woodbridge (DE 84) for summary judgment on the remaining counts within the amended complaint.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In

14

deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth the types of evidence on which a nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

## III. DISCUSSION AND ANALYSIS

The four claims at issue are as follows: (i) common law defamation; (ii) violation of plaintiff's right to equal protection of the laws under 42 U.S.C. § 1983 and the NJCRA, N.J. Stat. Ann. § 10:6–1 *et seq.*; (iii) violation of the NJLAD, N.J. Stat. Ann. § 10:5-12(f), based on discrimination in a place of public accommodation; and (iv) civil conspiracy to violate plaintiff's right to equal protection of the laws under 42 U.S.C. § 1985 and the NJLAD.[8]

For the reasons explained below, I will grant the defendants' summary judgment motions with respect to plaintiff's (i) defamation claim and (iii) claim for an alleged violation of the NJLAD, N.J. Stat. Ann. § 10:5-12(f), based on discrimination in a place of public accommodation. I will deny the defendants' summary judgment motions with respect to plaintiff's (ii) equal protection claim under 42 U.S.C. § 1983 and the NJCRA, N.J. Stat. Ann. § 10:6–1 *et seq.* and (iv) civil conspiracy to violate equal protection under 42 U.S.C. § 1985(3).

### A. Common Law Defamation (Count 1)

Count 1 asserts a claim for defamation arising from the May 22 Post. In that post, as updated, Pochek stated the following:

> (05/22/2014) The above individual is wanted for Theft by Deception among other offenses. He uses his home improvement company, Clark & Son Construction, to scam victims into paying for work that is never performed. He is identified as Clark SIGNO, NJ DL # [redacted], DOB [redacted], SSN [redacted]. He also goes by Clark DEMETRO among other names. Several possible

---

[8] Plaintiff has also asserted in his brief that his rights were violated under the "Privacy Act of 1974." (*See* Pl. Opp. to NABI at 21–22). The amended complaint does not contain any such claim. (*See generally* DE 21.) Opposition to a summary judgment motion is not the appropriate vehicle to insert new claims. *See Bey v. Daimler Chrysler Servs. of N. Am.*, 2006 WL 361385, at *11 (D.N.J. Feb. 15, 2006) ("[C]laims [that] were not alleged in the complaint . . . cannot be raised for the first time in opposition to a motion for summary judgment."). I therefore will not consider it. *See Anderson v. DSM N.V.*, 589 F. Supp. 2d 528, 534 n.5 (D.N.J. 2008) (declining to consider new breach of contract claim on summary judgment when plaintiff failed to plead that "particular claim" in the complaint).

addresses in Linden, Elizabeth, and Roselle were checked with negative results.

v

Warrant#W2014001345-1225 is entered (acs) with bail set at $30,000.

Any agency that knows the whereabouts of Clark Signo or with any further information can contact Det. Andrew Kondracki at 732-602-[redacted] or Det. Sgt. Richard Hardish at 732-602-[redacted].

(05/30/2014) Update to eLog entry dated 05/22/2014 by Robert Pocheck, Woodbridge PD (NJ), [redacted]. Information was received that Clark SIGNO was driving a gray 2013 Mercedes bearing NJ registration [redacted], which is registered to Joseph Schiavo of Egg Harbor Twp. It should be noted that this matches the description of one of the vehicles the victim stated Signo drove. I located that vehicle parked outside one of Signo's suspected residences [redacted], Elizabeth. On May 27, 2014, Clark SIGNO was arrested by members of the Woodbridge Police Tactical Squad as he pulled up to the residence in that vehicle. He was processed and released upon posting bail. He did not wish to make any statements on the matter. Case closed pending court hearing.

(May 22 Post, DE 90-1 at 5; DE 21, Count 1, ¶¶ 1-9).

Under New Jersey law, a claim for defamation has three elements: "(1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting at least to negligence by the publisher."[9] *Leang v. Jersey City Bd. of Educ.*, 198 N.J. 557, 585, 969 A.2d 1097 (2009).

---

[9]     When the content involves matters of public concern, the standard is not negligence but the higher one of actual malice. *G.D. v. Kenny*, 205 N.J. 275, 293, 15 A.3d 300, 310 (2011) ("Speech involving matters of public interest and concern triggers the higher actual-malice standard because free speech on such matters needs adequate breathing room in a democratic society. The actual-malice standard requires proof that the defamatory statement was published with knowledge that it was false or with reckless disregard of its truth or falsity." (internal citations and quotations omitted)).

    The parties do not argue that the allegedly defamatory speech here involved a matter of public concern. *See Hill v. Evening News Co.*, 314 N.J. Super. 545, 554-56,

To determine if a statement has a defamatory meaning, "a court must consider three factors: (1) the content, (2) the verifiability, and (3) the context of the challenged statement." *Id.* (internal quotations omitted). A defamatory statement is "'false and injurious to the reputation of another or exposes another person to hatred, contempt or ridicule or subjects another person to a loss of the good will and confidence in which he or she is held by others.'" *Soobzokov v. Lichtblau*, 664 F. App'x 163, 166 (3d Cir. 2016) (quoting *Romaine v. Kallinger*, 109 N.J. 282, 537 A.2d 284, 287 (1988)). "A defamatory statement, generally, is one that. . . deter[s] others from wanting to associate or deal with [the subject of the statement]." *G.D. v. Kenny*, 205 N.J. 275, 293, 15 A.3d 300, 310 (2011) (internal citations and quotations omitted).

If the May 22 Post were, as alleged, a false accusation of criminal conduct, it would be considered defamatory as a matter of law. *Kenny*, 205 N.J. 275, 293 ("A statement falsely attributing criminality to an individual is defamatory as a matter of law."); *see also Soobzokov v. Lichtblau*, 664 F. App'x 163, 168 (3d Cir. 2016); *Hill v. Evening News Co.*, 314 N.J. Super. 545, 552, 715 A.2d 999, 1002 (App. Div. 1998) ("[C]ertain statements are defamatory *per se,* including statements that the subject of the statement committed a crime."). In a defamation action, truth is a defense at common law; in addition, true speech is constitutionally protected. *Ward v. Zelikovsky*, 136 N.J. 516, 530, 643 A.2d 972, 979 (1994) ("True statements are absolutely protected under the First Amendment."); *Senna v. Florimont*, 196 N.J. 469, 480, 958 A.2d 427, 433 (2008) (same under New Jersey State Constitution). Thus, the defamation claim turns on the veracity of the May 22 Post.

---

715 A.2d 999, 1002-04 (App. Div. 1998) ("[T]he Court specifically rejected the contention that any person who engages in criminal conduct automatically becomes a limited purpose public figure for purposes of comment on issues related to his conviction." (citing *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 168, 99 S. Ct. 2701, 2708 (1979)). I will therefore assume that the negligence standard applies. *See Afiriyie v. Bank of Am., N.A.*, No. A-1595-10T2, 2013 WL 451895, at *9 (N.J. Super. Ct. App. Div. Feb. 7, 2013).

To be "true," a statement need not be "perfectly accurate"; the test is one of substantial accuracy. *Kenny*, 205 N.J. 275, 293. The law of defamation "overlooks minor inaccuracies and concentrates upon substantial truth." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516 (1991) ("Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified." (quotations and citation omitted)); *Salzano v. N. Jersey Media Group Inc.*, 201 N.J. 500, 523 (2010).

A court assessing the truth of a statement must consider it as a whole to determine the impression it will make on a reader. *Kenny*, 205 N.J. 275, 294; *Decker v. Princeton Packet, Inc.*, 116 N.J. 418, 561 A.2d 1122, 1125 (1989) (explaining that the "allegedly defamatory statement must be taken in context and the publication considered as a whole"). It also "must evaluate the criticized language according to the fair and natural meaning which it would be given by persons of ordinary intelligence." *Decker*, 116 N.J. 418, 425 (internal quotation and citation omitted); *Salzano*, 201 N.J. 500, 523.

Defendants contend that the May 22 Post was truthful and therefore not defamatory. (NABI Br. at 10). The website stated that Demetro "uses his home improvement company, Clark & Son Construction, to scam victims into paying for work that is never performed." (DE 90-1, pp. 5-7). As of that date, Demetro was accused of such conduct in a police report filed with the Woodbridge PD; warrants were issued for his arrest based on that conduct; and he was then being sought by the police. Later he was arrested and indicted, pled guilty to one of the charges in that indictment, and as part of his sentence was ordered to pay $ 6,350 in restitution to Del Rosso. *See* Subsection I.A., *supra*.

The cases require a comprehensive reading of allegedly defamatory statements, taking into account the (a) the context of the statement, (b) the audience, and (c) the ordinary meaning an objective reader of ordinary intelligence would infer. *Kenny*, 205 N.J. 275, 294; *Salzano*, 201 N.J. 500, 523; *Decker*, 116 N.J. 418, 561 (1989); *Hill*, 314 N.J. Super. 545, 552.

I first consider (a), the context. In the context of the sentences immediately preceding and following it, this sentence in the May 22 Post would be fairly understood as indicating no more than that Demetro was *accused of* "scam[ming] victims into paying for work that is never performed." (DE 90-1, pp. 5-7). The opening sentence of the May 22 Post starts by explaining that Demetro was "*wanted* for Theft by Deception among other offenses," a true statement. (*Id.*) (emphasis added). The next sentence—the alleged defamatory statement—is that Demetro used Clark & Sons "to scam victims into paying for work that is never performed." (*Id.*). Immediately thereafter, it lists the warrant number, explains that Demetro is being sought, and gives phone numbers to report leads about his whereabouts. (*Id.*). The context of the statement is clearly that it is summarizing the nature of a pending criminal charge. In that respect, the post was accurate—Demetro was surely criminally accused of such conduct.[10]

I next consider (b), the audience for the statement. The readers of the May 22 Post were NABI members: people working directly for law enforcement agencies or those generally affiliated with the industry. The relevant portion of the website was confined to law enforcement.[11]

Finally, I consider (c), what an objectively reasonable member of that audience would infer from the statement. An objective person—and particularly

---

[10]     In the end, Demetro pled guilty to one count of Failure to Display Registration Number. (The relevant statute, N.J. Stat. Ann. 56:8-144, requires contractors to display their registration at their place of business, in all contracts and correspondence, etc.). On March 6, 2015, Demetro was sentenced to one year of probation and was ordered to pay restitution to Del Rosso in the amount of $6,350—a figure clearly representing the total Del Rosso paid minus $600, the value of the work performed on the gutters. The clear implication is that Demetro charged Del Rosso for work not performed. So the statement in the May 22 Post, even if construed as one of simple fact rather than a summary of charges, would be defensible as true.

[11]     I do not credit Demetro's assertion that because he was able to access the NABI posts about himself they must be accessible to non-NABI members more broadly. Demetro was evasive in explaining how he accessed the NABI materials and also refused to name the LE member who supposedly shared the information with him. *See* Subsection I.A.iii., *supra*.

a member of that specialized law enforcement audience—would surely understand that the May 22 Post was based on accusations of misconduct that had yet to be proven. The May 30 Update confirmed that Demetro had now been arrested, and ended with the statement "Case closed pending court hearing," an implicit acknowledgement that the judicial process had not yet played out.[12]

In sum, then, the May 22 Post is fairly read as communicating that Demetro was *accused* of misconduct. That was truthful.[13] Consequently, the May 22 Post does not satisfy a critical element of defamation under New Jersey law.

The case law, while not precisely on point, is supportive of that conclusion. For example, in *Molin v. Trentonian*, 297 N.J. Super. 153, 155, 687 A.2d 1022, 1022 (App. Div. 1997), a local newspaper published an article about the plaintiff's arrest for stalking. The headline on the first page read "Stalker's Arrest Ends Year of Terror." Next to that headline was a photograph of the plaintiff, with the word "Charged" underneath. *Id.* at 156–58. The plaintiff claimed that the statements were defamatory because at the time he was only an "alleged stalker," and was eventually found not guilty. *Id.*

The Appellate Division affirmed the trial judge's decision that "[n]either the article nor headline, read in context," was false. *Id.* at 159. Police reports

---

12    It is unclear what is meant by "Case closed." The case in question cannot be the court case; the same sentence states that a hearing is pending. It may simply refer to the report of an outstanding arrest warrant on the website, which "case" was now "closed" because the suspect had been apprehended.

13    Repeating a defamatory statement can itself constitute a defamatory publication. *Taj Mahal Travel, Inc. v. Delta Airlines, Inc.*, 164 F.3d 186, 189 (3d Cir. 1998) (citing *Kotlikoff v. Community News,* 89 N.J. 62, 444 A.2d 1086, 1088 n. 1 (N.J.1982)). The parties here do not really assert that Del Rosso defamed Demetro when he complained to the Woodbridge PD. Such a complaint would in any event be subject to a qualified privilege. *See Williams v. Bell Tel. Labs. Inc.*, 132 N.J. 109, 120, 623 A.2d 234, 239 (1993) ("The general rule is that a statement charging a criminal violation, made to a law-enforcement official, is qualifiedly privileged."); *Flythe v. Ralph Lauren, Inc.*, No. 16-1321, 2016 WL 6806340, at *3 (D.N.J. Nov. 17, 2016).

documented the "year of terror" that precipitated the anti-stalking law. The plaintiff admitted that he was arrested for stalking, which was the gist of the article. *Id* ("[T]here was nothing false as to plaintiff's status as an arrestee for the crime of stalking."). Consequently, the court affirmed the grant of summary judgment because it was truthful in its overall sense that the plaintiff was accused of the reported misconduct. *Id.*; *see also Hill*, 314 N.J. Super. 545, 552; *Lawrence v. Bauer Pub. & Printing Ltd.*, 89 N.J. 451, 461, 446 A.2d 469, 474 (1982) ("[A] statement that criminal charges were imminent would be truthful only if such charges were demonstrably impending."); *Durando v. Nutley Sun*, 209 N.J. 235, 239, 37 A.3d 449, 451 (2012); *Taj Mahal Travel, Inc. v. Delta Airlines, Inc.*, 164 F.3d 186, 195 (3d Cir. 1998) (Garth, J., dissenting); *Dangerfield v. WAVY Broad., LLC*, 228 F. Supp. 3d 696, 701–04 (E.D. Va. 2017); *Thorn v. McGary*, 684 F. App'x 430, 435 (5th Cir. 2017) (not precedential); *Yohe v. Nugent*, 321 F.3d 35, 43 (1st Cir. 2003) ("[A] newspaper's publication of the fact that one has been arrested, and upon what accusation, is not actionable, if true." (internal quotation and citation omitted)); *Cianci v. New Times Pub. Co.*, 639 F.2d 54, 60 (2d Cir. 1980) (noting distinction in allegedly defamatory statement between whether plaintiff "was *in fact* a rapist and an obstructor of justice" versus "simply a person who had been *accused* of being such" (emphasis added)); *Jeter v. McKeithen*, No. 14-189 (RS) (EMT), 2014 WL 4996247, at *3 (N.D. Fla. Oct. 7, 2014); *Nichols v. Moore*, 396 F. Supp. 2d 783, 790–92 (E.D. Mich. 2005).

To be sure, it would have been better if each sentence of the May 22 Post repeated that this was a report of a criminal charge, not an independent statement of fact. The sentence isolated by Demetro might more prudently have stated that Demetro was *accused of* "us[ing] his home improvement company, Clark & Son Construction, to scam victims into paying for work that is never performed." The applicable standard, however, is not one of optimality or room-for-improvement. The sense of the statement, viewed in context, was that it truthfully reported a criminal accusation. Statements that are "fairly accurate"

when viewed in context are subject to the defense of truth. *Kenny*, 205 N.J. 275, 293.

The sentences surrounding the allegedly defamatory sentence explain that Demetro was "wanted" on that charge, that an arrest warrant had issued, and that he was being sought by the police. A person of ordinary understanding, and particularly a law enforcement employee, would understand that the "substance" or "gist" of the May 22 Post was based on accusations against Demetro, and that implicit in the supposedly defamatory sentence was an allegation, not a conclusion, of wrongdoing. *Masson*, 501 U.S. 496, 516; *Kenny*, 205 N.J. 275, 293.

Therefore, I will grant NABI's motion for summary judgment as to the defamation claim in Count 1.[14]

### B. Discrimination in a Place of Public Accommodation (Count 6)

In Count 6, Demetro asserts a claim under the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5-12(f), for discrimination in a place of public accommodation. To prevail on such a claim a plaintiff must show that "'(1) defendant operates a place of public accommodation; (2) the plaintiff is a member of a protected class; and (3) he or she was denied equal treatment on the basis of his or her membership in a protected class.'" *Vandeusen v. Mabel Realty of Bordentown, LLC*, No. 12-0330, 2012 WL 1664116, at *3 (D.N.J. May 11, 2012) (citing N.J. Stat. Ann. § 10:5–12(f); *Dasrath v. Continental Airlines, Inc.*, 2006 WL 372980 (D.N.J. Feb. 16, 2006)).

The threshold issue here is whether NABI's website is a place of public accommodation. NABI contends that a place of accommodation must be a physical place that is open to the public. (NABI Br. at 16). Demetro demurs, citing, *e.g., Ptaszynski v. Uwaneme* 371 N.J. Super. 333, 853 A.2d 288 (App.

---

[14]     Because I rule based on the defense of truth, I do not reach defendants' arguments regarding qualified immunity. (*See* NABI Br. at 11–12 ("[E]ven if *arguendo* the May 22 Statement was untrue, the qualified immunity shields NABI from liability."); RP/W Br. at 29).

Div. 2004), which held that "the Township police department—both the building and the individual officers—is a place of public accommodation." 371 N.J. Super. 333, 347, 853 A.2d 288, 297 (App. Div. 2004).

Demetro thus seeks to analogize NABI's internet website to a municipal police force. Denying the defendants' motion to dismiss, I wrote that "the aptness of that analogy may depend on the facts as developed in discovery." *Demetro v. Nat'l Ass'n of Bunco Investigations*, No. 14-6521, 2017 WL 3923290, at *14 (D.N.J. Sept. 7, 2017). Discovery has now closed, and I cannot find factual support for a holding that NABI's website is a place of public accommodation under the NJLAD.

In *Ptaszynski*, two arrestees sued police officers, a municipality, and its police department for an alleged NJLAD violation, claiming that they were beaten and verbally abused due to their race. 371 N.J. Super. 333, 344. The trial court held that the police department was not a place of public accommodation and dismissed plaintiffs' NYLAD claim on that basis. *Id.* The Appellate Division reversed, holding that "[a]s a public entity, by its very nature a police force is a place of public accommodation." 371 N.J. Super. 333, 347. The court reasoned as follows:

> No formulistic analysis is required to determine whether the police engage in public solicitation or a police department is similar to those entities enumerated as public accommodations under the [NJLAD] statute. A police department is not a private entity that needs to be shoe-horned into a list of other, primarily private, entities that provide services to the public. It would indeed lead to an anomalous result if private organizations with close ties to government agencies were places of public accommodation because of those ties, while the government agency itself was not.

*Id.*

*Vandegrift v. Bowen*, No. 07-2623, 2009 WL 1913412 (D.N.J. June 30, 2009), upheld an NJLAD claim against the City of Margate for allegedly failing to implement policies and procedures within its police department relating to sexual harassment of women. 2009 WL 1913412, at *3. *Vandegrift* cited *Ptaszynski* for the proposition that "discriminatory acts of law enforcement

24

officers are considered public accommodation discrimination under the NJLAD." *Id. Vandegrift* found an NJLAD claim for public accommodation discrimination was sufficiently pled where the plaintiff alleged that "a member of the police department discriminated and/or harassed her because of her sex" and the City of Margate failed to prevent these acts. *Id.* at \*5.

Neither *Ptasynski* nor *Vandegrift,* the cases relied on by Demetro here, involved a website. Nor does the mere fact of a law enforcement connection, or the presence of police officers in NABI's membership, persuade me that the police department/website analogy is a good one.

One important factor in identifying a place of public accommodation is whether the entity "engages in broad public solicitation." *Dale v. Boy Scouts of Am.,* 160 N.J. 562, 589, 734 A.2d 1196, 1210 (1999), *rev'd on other grounds,* 530 U.S. 640, 120 S. Ct. 2446, 147 L. Ed. 2d 554 (2000). Here, there is little evidence that the NABI website seeks or solicits broad public participation. NABI does not maintain a physical location in New Jersey, or specifically advertise there. NABI's online database is not generally available for viewing by the public, but instead requires membership in either the associate class or law enforcement class, the latter of which requires employment at a law enforcement agency. Still, there is a broader class of NABI members potentially drawn "from the public at large" *via* the website. *See Clover Hill Swimming Club, Inc. v. Goldsboro,* 47 N.J. 25, 33, 219 A.2d 161, 165 (1966). This factor, then, generally favors NABI but does not wholly weigh in its favor.

A second public accommodation factor is whether the entity in question "is similar to enumerated or other previously recognized public accommodations." *Id.* The NJLAD itself provides a wide-ranging, non-exhaustive list of public accommodations:

> any tavern, roadhouse, hotel, motel, trailer camp, summer camp, day camp, or resort camp, whether for entertainment of transient guests or accommodation of those seeking health, recreation, or rest; any producer, manufacturer, wholesaler, distributor, retail shop, store, establishment, or concession dealing with goods or services of any kind; any restaurant, eating house, or place where food is sold for

consumption on the premises; any place maintained for the sale of ice cream, ice and fruit preparations or their derivatives, soda water or confections, or where any beverages of any kind are retailed for consumption on the premises; any garage, any public conveyance operated on land or water or in the air or any stations and terminals thereof; any bathhouse, boardwalk, or seashore accommodation; any auditorium, meeting place, or hall; any theatre, motion-picture house, music hall, roof garden, skating rink, swimming pool, amusement and recreation park, fair, bowling alley, gymnasium, shooting gallery, billiard and pool parlor, or other place of amusement; any comfort station; any dispensary, clinic, or hospital; any public library; and any kindergarten, primary and secondary school, trade or business school, high school, academy, college and university, or any educational institution under the supervision of the State Board of Education or the Commissioner of Education of the State of New Jersey.

N.J. Stat. Ann. § 10:5-5(l).

None of these enumerated places of public accommodation are electronic in nature, or online. Moreover, the Third Circuit has held that, in the context of Title III of the Americans with Disabilities Act, 42 U.S.C. § 12182 ("ADA"), the term "public accommodation . . . is limited to *physical* accommodations." *Peoples v. Discover Fin. Servs., Inc.*, 387 F. App'x 179, 183 (3d Cir. 2010) (emphasis added; citing *Ford v. Schering-Plough Corp.*, 145 F.3d 601, 612 (3d Cir. 1998)); *see also Walker v. Sam's Oyster House, LLC*, No. 18-193, 2018 WL 4466076, at *2 (E.D. Pa. Sept. 18, 2018); *Bowers v. Nat'l Collegiate Athletic Ass'n*, 9 F. Supp. 2d 460, 483 (D.N.J. 1998) ("the Third Circuit has recently held, and quite rightly, that a public accommodation within the meaning of 42 U.S.C. § 12181(7) is a physical place." (citing *Ford*, 145 F.3d 601, 612)).

Courts have considered interpretations of the ADA when interpreting the NJLAD. *See Lasky v. Borough of Hightstown*, 426 N.J. Super. 68, 76, 43 A.3d 445, 451 (App. Div. 2012); *Chisolm v. McManimon*, 275 F.3d 315, 325 n.9 (3d Cir. 2001). I take the Third Circuit's interpretation of place of public accommodation in the ADA context to be highly persuasive if not literally

controlling here.[15] I hold that a "location" in cyberspace, such as NABI's website, is not a "place" of public accommodation under the NJLAD.

I turn, however, to an alternative theory that NABI itself, as opposed to its website, might be deemed a place of public accommodation. Membership organizations have been recognized as potential places of public accommodation for purposes of an NJLAD claim. *See Dale*, 530 U.S. 640 (noting that the definition of public accommodation "has expanded from clearly commercial entities" to "membership organizations such as the Boy Scouts"); *Frank v. Ivy Club*, 120 *N.J.* 73, 79, 110, 576 A.2d 241 (1990) (eating clubs); *Nat'l Org. for Women, Essex Cty. Chapter v. Little League Baseball, Inc.*, 127 N.J. Super. 522, 531, 318 A.2d 33, 37 (App. Div. 1974) (Little League Baseball); *Clover Hill Swimming Club v. Goldsboro*, 47 N.J. 25, 33–34, 219 A.2d 161 (1966) (swimming club); N.J. Stat. Ann. § 10:5-12(f)(2).

NABI is indeed a membership organization. Such a theory, however, does not fit Demetro's public-accommodation claim. NJLAD explicitly makes it unlawful for a person with authority at a place of public accommodation "to refuse, withhold from or deny to any person" the advantages of the accommodation, "or to discriminate against any person in the furnishing thereof." N.J. Stat. Ann. § 10:5-12(f). Demetro does not claim that he sought membership in NABI or a physical facility maintained by NABI, but was excluded based on his ethnicity. Nor is Demetro a member of NABI whose membership rights were somehow curtailed in a discriminatory fashion.

---

[15]     Cases by district courts within the Third Circuit have found a website to be a place of public accommodation, typically if the website had a sufficient nexus to a physical place of public accommodation. *See Suchenko v. ECCO USA, Inc.*, No. 18-0562, 2018 WL 3933514, at *3 (W.D. Pa. Aug. 16, 2018); *Tawam v. APCI Fed. Credit Union*, No. 18-00122, 2018 WL 3723367, at *6 (E.D. Pa. Aug. 6, 2018) ("The website is a service offered by [defendant] and therefore may be subject to the ADA if it has a sufficient nexus to [defendant's] physical location."); *Gniewkowski v. Lettuce Entertain You Enterprises, Inc*, 251 F. Supp. 3d 908 (W.D. Pa. 2017) (finding bank's website to be a place of public accommodation for ADA claim). That is not the case here.

Rather, Demetro claims that NABI performed a wrongful or discriminatory act when it catalogued him on their website as a 'transient criminal' due to his ethnicity. That allegation may support a grievance, or some sort of claim of discrimination. It is not a claim that Demetro was denied equal access to or enjoyment of a place of public accommodation.

I will grant defendants' motion for summary judgment on Count 6, discrimination in a place of public accommodation under NJLAD, N.J. Stat. Ann. § 10:5-12(f).

### C. Equal Protection under 42 U.S.C. § 1983 and NJCRA (Count 5)

In Count 5, Plaintiff asserts claims under 42 U.S.C. § 1983 and the NJCRA, N.J. Stat. Ann. § 10:6-1 *et seq.*,[16] for the violation of his right to equal protection. The Fourteenth Amendment to the U.S. Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1. "Article I, paragraph 1 of the New Jersey Constitution has been interpreted 'as conferring the right of equal treatment under the law, a right analogous to the guarantee of equal protection under the Fourteenth Amendment.'" *In re D'Aconti*, 316 N.J. Super. 1, 19, 719 A.2d 652, 660 (App. Div. 1998) (citing *Doe v. Poritz*, 142 N.J. 1, 43, 662 A.2d 367 (1995)).

Demetro essentially asserts a claim of racial profiling or unequal application of the laws on the basis of his Romani ethnicity. From the allegations, this could mean either of two things: (1) that NABI is responsible for Demetro's having been selectively prosecuted over the years; or (2) that the website's inclusion of Demetro and listing of criminal allegations against him was itself discriminatory.

---

[16]     The NJCRA "was modeled after 42 U.S.C. § 1983, and creates a private cause of action for violations of civil rights secured under the New Jersey Constitution[]." *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443 (D.N.J. 2011). "This district has repeatedly interpreted NJCRA analogously to § 1983." *Id* (collecting cases).

#### i. State action

A threshold requirement of a § 1983 claim is that the defendant have acted "under color of state law." *Sprauve v. W. Indian Co.*, 799 F.3d 226, 229 (3d Cir. 2015) (citing *Groman v. Twp. of Manalapan,* 47 F.3d 628, 638 (3d Cir. 1995)). Likewise, the equal protection clause is also directed at official conduct, and therefore requires "state action." *Id.* (citing *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937, 102 S. Ct. 2744 (1982)); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 619, 111 S. Ct. 2077, 2082 (1991) ("The Constitution's protections of individual liberty and equal protection apply in general only to action by the government."). Those two analyses are equivalent. *Sprauve*, 799 F.3d 226, 229 (citing *Leshko v. Servis,* 423 F.3d 337, 339 (3d Cir. 2005)); *Crissman v. Dover Downs Entm't Inc.*, 289 F.3d 231, 234 (3d Cir. 2002) ("Where a defendant's conduct is state action under the Fourteenth Amendment, it is also conduct under color of state law for § 1983."). This presents the question of whether NABI was a state actor for purposes of this claim. *Leesville Concrete Co.*, 500 U.S. 614, 619 ("Racial discrimination, though invidious in all contexts, violates the Constitution only when it may be attributed to state action.").

In limited circumstances, a private person or entity can be considered a state actor when that private party assumes and effectuates a sufficient level of government authority. *Leesville Concrete Co.*, 500 U.S. 614, 620 ("Although the conduct of private parties lies beyond the Constitution's scope in most instances, governmental authority may dominate an activity to such an extent that its participants must be deemed to act with the authority of the government and, as a result, be subject to constitutional constraints. This is the jurisprudence of state action, which explores the essential dichotomy between the private sphere and the public sphere, with all its attendant constitutional obligations." (internal quotations and citation omitted)).

A court considering whether alleged conduct by a private party constituted state action must ask (1) "whether the claimed constitutional

deprivation resulted from the exercise of a right or privilege having its source in state authority"; and (2) "whether the private party charged with the deprivation could be described in all fairness as a state actor." *Id.* (citing *Lugar,* 457 U.S. at 937–42, 102 S. Ct. 2744); *Brown v. Philip Morris Inc.,* 250 F.3d 789, 801 (3d Cir. 2001).

NABI is a private organization, not a state actor in the ordinary sense. However, plaintiff argues that NABI's conduct can be fairly attributed to the state for purposes of its equal protection claim. NABI, he says, effectuates government authority since its members include law enforcement personnel who act in that official capacity when collecting and disseminating non-public information about suspects in ongoing law enforcement investigations. (Pl. Opp. to NABI at 19–21). I agree that Demetro has put forward enough to present a material question of fact as to whether NABI should be considered a state actor for purposes of plaintiff's constitutional claim.

The following factors are relevant in determining whether a particular course of conduct is governmental in character: "the extent to which the actor relies on governmental assistance and benefits, whether the actor is performing a traditional governmental function, and whether the injury caused is aggravated in a unique way by the incidents of governmental authority." *Leesville Concrete Co.,* 500 U.S. 614, 621–22 (internal citations omitted).

The crux of the state action analysis "is not whether the state was involved in some way in the relevant events, but whether the action taken can be fairly attributed to the state itself." *Groman,* 47 F.3d 628, 638; *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 295, 121 S. Ct. 924, 930, 148 L. Ed. 2d 807 (2001) ("[S]tate action may be found if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." (internal quotations and citation omitted)); *NCAA v. Tarkanian,* 488 U.S. 179, 192, 109 S.Ct. 454, 462, 102 L.Ed.2d 469 (1988) ("[W]e ask whether the State provided a mantle of authority that enhanced the power of the harm-causing

individual actor."); *West v. Atkins*, 487 U.S. 42, 49, 108 S. Ct. 2250, 2255, 101 L. Ed. 2d 40 (1988) ("The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." (internal quotation and citation omitted)).

Additionally, the U.S. Supreme Court appears to employ three related tests, depending on the factual scenario, to determine whether private conduct can be deemed state action.[17] Those tests include the following: (1) the "exclusive government function approach"; (2) the "joint participation or symbiotic relationship approach"; and (3) the "nexus approach." *Groman*, 47 F.3d 628 (collecting cases); *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995) (collecting cases). No matter which test a court evaluates, it "must remain focused on the heart of the state action inquiry, which. . . is to discern if the defendant exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Groman*, 47 F.3d 628, 639 (internal quotations and citation omitted).[18]

---

[17]    "The Supreme Court pointed out in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), that it has never been clear '[w]hether these different tests are actually different in operation or simply different ways of characterizing the necessarily fact-bound inquiry that confronts the Court in [each] situation.'" *Crissman v. Dover Downs Entm't Inc.*, 289 F.3d 231, 239 n. 12 (3d Cir. 2002) (also citing *Groman*, 47 F.3d 628, 639 n. 16).

No matter which test is used to evaluate the case, courts should "focus on the fact-intensive nature of the state action inquiry, mindful of its central purpose: to assure that constitutional standards are invoked when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." *Id.* at 239 (internal citation and quotation omitted); *see also Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295, 121 S. Ct. 924, 930, 148 L. Ed. 2d 807 (2001) ("What is fairly attributable [to the state] is a matter of normative judgment, and the criteria lack rigid simplicity.").

[18]    None of the parties meaningfully grappled with any of these tests. NABI's sole argument on this front is that "no law enforcement official who arrested Demetro was doing so in their capacity as a member of NABI." (NABI Br. at 15). That argument misses the point. The question is whether the conduct of NABI *qua* NABI constitutes state action—whether other officers acted on NABI's behalf is not relevant. Moreover, it is somewhat inconsistent for NABI to argue that it is not a state actor in the equal

31

The plaintiff has put forward enough facts to survive defendants' summary judgment motion on this issue. However, questions of fact remain as to whether NABI shares a sufficient nexus with the state. NABI's law enforcement members seemingly use their positions of authority within the state to obtain and disseminate through its website personally identifiable information about alleged criminal suspects. It remains an open question, *inter alia*, whether the information, once on the website, is accessible to the public, whether or to what extent NABI members use the state's resources in collecting that information, and whether the state allows or supports this conduct. From the face of the record, a fact finder could conclude that the posted content is at least in part confidential, since it includes PII and information from ongoing criminal investigations. Such questions will bear on the ultimate question of whether NABI qualifies as a state actor.

Gathering information about people for the purpose of pursuing criminal prosecutions is traditionally a function of the government, and it is typically performed by police departments and prosecutors' offices. It is no coincidence that the membership of NABI mostly consists of individuals who work in or are affiliated with law enforcement agencies. NABI limits certain information about suspects to its law enforcement members, which indicates a belief that only those cloaked with the authority of the state ought to have access to this information.

Additionally, assuming *arguendo* that NABI's conduct does violate plaintiff's equal protection rights, that injury would certainly be "aggravated in a unique way by the incidents of governmental authority." *Leesville Concrete Co.*, 500 U.S. 614, 621–22. NABI's ability to have its law enforcement members access government databases and confidential investigatory materials is a direct incident of governmental authority aggravating the assumed injury. *See*

---

protection context while it also asserts that its nexus to the state should subject it to qualified immunity in the defamation context. (NABI Br. at 11–12, 14–15).

*Rossignol v. Voorhaar*, 316 F.3d 516, 526 (4th Cir. 2003) ("[The defendants']
status as sheriff's deputies enabled them to execute their scheme in a manner
that private citizens never could have."). But for the state's resources, it is an
open question whether NABI would even be able to gather the personally
identifiable information and suspect reports it puts on its website. In that
respect, material questions of fact exist as to whether NABI's actions may "be
fairly attributed to the state itself." *Groman*, 47 F.3d 628, 638; *Brentwood
Acad.*, 531 U.S. 288, 295.

Because there is at least an issue of fact as to state action, I proceed to
the merits of the claim.

### ii.    *Merits of equal protection claim*

"[T]he Constitution prohibits selective enforcement of the law based on
considerations such as race.... [T]he constitutional basis for objecting to
intentionally discriminatory application of laws is the Equal Protection Clause."
*Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774 (1996).

Demetro's equal protection claim is that if he "was not Gypsy, he would
not be continuously included on NABI and targeted by the law enforcement
members of NABI, who have charged him approximately 26 times for crimes
over the past 15 years; he would not be falsely accused of having a criminal
record of violence." (Cplt. Count 5 ¶ 7)[19] As noted above, Demetro seems to be
claiming either (1) that NABI is responsible for Demetro's having been
selectively prosecuted over the years; or (2) that the website's inclusion of
Demetro and listing of criminal allegations against him was itself
discriminatory.

The first theory is easily disposed of. Nothing in the proofs submitted by
Demetro suggests that his 26 criminal prosecutions and three convictions
resulted from anything that NABI or its members did or did not do. A claim of

---

[19]    Although Count Five is titled "Defamation and False Light," it cites 42 U.S.C. §
1983 and explicitly states that "[s]electively targeting persons because of their race
violates the NJ and US Constitution's Equal Protection Clauses." *Id.* ¶ 8.

selective prosecution requires that the defendant did the selecting or acted on behalf of the person who did. That is not alleged here.[20]

I therefore move to the second claim, that Demetro was included in the website's postings on a discriminatory basis. Such a claim, standing alone, may or may not give rise to substantial damages, but that is irrelevant to my conclusion that the proofs are sufficient to make out such a claim.

To state an equal protection claim "in the racial profiling context, a plaintiff must allege that law enforcement actions: '(1) had a discriminatory effect and (2) were motivated by a discriminatory purpose.'" *See Alvin v. Calabrese*, 455 F. App'x 171, 177 (3d Cir. 2011) (quoting *Bradley v. United*

---

[20]    Difficult questions of probable cause and intent are thus beside the point.

Generally, plaintiffs in retaliatory prosecution cases must "show more than the subjective animus of an officer and a subsequent injury; plaintiffs must also prove as a threshold matter that the decision to press charges was objectively unreasonable because it was not supported by probable cause." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1723 (2019) ("[E]ven when an officer's animus is clear, it does not necessarily show that the officer 'induced the action of a prosecutor who would not have pressed charges otherwise.'") (quoting Hartman v. Moore, 547 U.S. 250, 263, 126 S. Ct. 1695, 164 L. Ed. 2d 441 (2006)). Similarly, plaintiffs asserting a retaliatory arrest claim generally "must plead and prove the absence of probable cause for the arrest." *Nieves*, 139 S. Ct. 1715, 1724 (2019); *but see id.* at 1724 (noting that in the context of an arrest where the defendant officers allegedly retaliated against a plaintiff for his protected First Amendment speech, "the no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been.").

However, plaintiffs alleging claims for racially selective arrests or prosecutions in violation of the Fourteenth Amendment are *not* required to show a lack of probable cause. *See Nieves*, 139 S. Ct. 1715, 1731–32 (2019) (Gorsuch, J., concurring in part and dissenting in part) (citing *Hedgepeth v. Washington Metropolitan Area Transit Auth.*, 386 F. 3d 1148, 1156 (D.C. Cir. 2004) ("[S]imply because a practice passes muster under the Fourth Amendment (arrest based on probable cause) does not mean that unequal treatment with respect to that practice is consistent with equal protection.")); *see also Gibson v. Superintendent of NJ Dep't of Law & Pub. Safety-Div. of State Police*, 411 F.3d 427, 440 (3d Cir. 2005) ("'The fact that there was no Fourth Amendment violation does not mean that one was not discriminatorily selected for enforcement of a law. Plaintiffs' equal protection claims under the Fourteenth Amendment require a wholly separate analysis from their claims under the Fourth Amendment.'" (quoting *Carrasca v. Pomeroy*, 313 F.3d 828, 836 (3d Cir.2002))).

*States,* 299 F.3d 197, 205 (3d Cir. 2002)). To show discriminatory effect, a plaintiff must prove "that she is a member of a protected class and that she was treated differently from similarly situated individuals in an unprotected class." *See id.* (quoting *Bradley,* 299 F.3d 197, 206). Here, Demetro's Romani ethnicity "must have been a substantial factor" in the allegedly different treatment that he received by defendants. *Hassan v. City of New York,* 804 F.3d 277, 294 (3d Cir. 2015).

As to discriminatory effect, plaintiff has adequately established that he is a member of a protected ethnic class.[21] Therefore, the "sole inquiry under this

---

[21]    Historically, being of Romany descent has subjected persons to discrimination. *See United States v. Lacher,* 134 U.S. 624, 629, 10 S. Ct. 625, 33 L.Ed. 1080 (1890) (mentioning that historically, "to be seen for a month in the company of gypsies" was punishable by death). While use of the term "gypsy," without more, is perhaps insufficient to establish discriminatory intent, when it is used as part of an ethnic stereotype, it may create an inference of prejudice.

*United States v. Marks,* No. 11-80072-CR, 2013 WL 4502319, at *4 (S.D. Fla. Mar. 5, 2013), *report and recommendation adopted,* No. 11-80072-CR, 2013 WL 4502309 (S.D. Fla. Aug. 23, 2013). There is a deplorable history, particularly in Europe, of vilification and discrimination against the Roma, culminating in the murder of untold thousands in the Nazi holocaust.

Under antidiscrimination statutes such as 42 U.S.C. § 1981, protected status for the Roma is not an endorsement of racial or ethnic pseudo-science, but rather is based on lay perceptions, however erroneous, and a history of discrimination:

Based on the history of § 1981, we have little trouble in concluding that Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics. Such discrimination is racial discrimination that Congress intended § 1981 to forbid, whether or not it would be classified as racial in terms of modern scientific theory.

*St. Francis Coll. v. Al–Khazraji,* 481 U.S. 604, 613, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987).

Romani or "gypsy" have likewise been recognized as an actionable ethnic category for purposes of a Title VII discrimination claim. *See Janko v. Illinois State Toll Highway Auth.,* 704 F. Supp. 1531, 1532 (N.D. Ill. 1989) (finding that persons of "Gypsy" descent fit within the definition of national origin–even if the term "Gypsy" is not related to some particular nation or region–because Congress intended Title VII to prevent discrimination against people "based upon ethnic distinctions commonly

prong of the analysis" is whether the plaintiff was treated "differently from similarly situated members of an unprotected class." *Bradley*, 299 F.3d 197, 206. Discriminatory effect "'may be proven by naming similarly situated members of an unprotected class who were not selected for the same [treatment] or, in some cases, by submitting statistical evidence of bias.'" *Calabrese*, 455 F. App'x 171, 177 (quoting *Bradley*, 299 F.3d at 206).

Plaintiff has pointed to postings in NABI's database that appear to segregate and catalogue Romani 'suspects' with the demarcation "G/M" or "G/F", which inferably stand for "Gypsy/Male" and "Gypsy/Female." This is not necessarily evidence of discrimination, but it may be. *See Hassan*, 804 F.3d 277, 295 (noting that it was a "viable legal theory" to assert that the defendant's program "relie[d] on an express classification of Muslims for disfavored treatment" and that "direct evidence of intent is 'supplied by the policy itself.'" (quoting *Massarsky v. Gen. Motors Corp.*, 706 F.2d 111, 128 (3d Cir. 1983) (Sloviter, J., dissenting))); *see also Marshall*, 345 F.3d 1157, 1170 (acknowledging that a jury might think it significant that a police officer when

---

recognized at the time of discrimination") (cited in *Almendares v. Palmer*, No. 3:00-CV-7524, 2002 WL 31730963, at *10 (N.D. Ohio Dec. 3, 2002)).

Still, there is a surprising dearth of direct authority concerning Romani ethnicity and equal protection. *See Demetro v. Police Dep't, City of Cherry Hill, N.J.*, No. 11-4377 (JLL), 2011 WL 5873063, at *1 n.1 (D.N.J. Nov. 22, 2011) ("While the Third Circuit Court of Appeals has recognized the Roma as a distinct ethnic group in its review of removal decisions by the Board of Immigration Appeals, there is no case law classifying the Roma people either as a 'protected class' based on race, alienage[,] or national origin or as a 'discrete and insular minority' in accordance with *Carolene Products. United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234; *see Marinescu v. AG of the United States*, 284 Fed. App'x. 889 (3d Cir. 2008). However, litigation targeting alleged discrimination against the Roma has proliferated outside the United States, and in non-binding fora such as the European Court of Human Rights, Romani children have successfully brought claims against school segregation in the Czech Republic found to violate prohibitions on racial discrimination in the European Convention on Human Rights. *See D.H. and Others v. Czech Republic*, 57325/00, Council of Europe: European Court of Human Rights, 7 February 2006, *available at* www.unhcr.org/refworld/docid/469e020e2.html).

giving a traffic ticket, in the box designated for the gender of the driver "wrote B/M, making a racial designation where none was called for.").

While some of the posts were for "W/M" or "W/F", inferably indicating "White/Male" and "White/Female", most of the postings in the record show "G/M" or "G/F" underneath the photos. This designation facially appears to single out persons of Romani descent. When "viewed in the light most favorable to [the plaintiff]", *Bradley*, 299 F.3d at 207, this designation tends to create a question of fact as to whether NABI's database of alleged criminal suspects has a disproportionate, discriminatory purpose or effect on people of Romani descent. In a literal sense, NABI did treat Demetro differently by categorizing him as "G/M" as opposed to something else, and most of the people in the extract of the website given to the Court are labelled either "G/M" or "G/F". The extent of this separate treatment deserves further factual development and a determination from a fact finder as to its discriminatory effect.

Even if a subset of the individuals featured in NABI's database were non-Romani males or females, that alone would not be enough to rebut the inference of a discriminatory impact upon members of a protected class. *See Chavez v. Illinois State Police*, 251 F.3d 612, 637 (7th Cir. 2001) ("The relevant inquiry is whether a similarly situated individual was treated differently than the plaintiff, not whether one white motorist was subjected to the same unlawful treatment. Allowing defendants to escape liability for discriminating against Hispanics simply because they occasionally mistreat white motorists would dismantle our equal protection jurisprudence."). This presents "a factual issue which the District Court [is] not free to decide" at this procedural stage. *Carrasca v. Pomeroy*, 313 F.3d 828, 834 (3d Cir. 2002).

There is more evidence of discriminatory effect. The slogan or catch line on NABI's website was the following: "Ignorance is the Gypsies' weapon against the outside world." (DE 90-1 at 40). Plaintiffs assert that NABI is a 'Gypsy Task Force' that centers its activities around cultivating a database of suspected Romani criminals. This slogan and the other written content posted on NABI's

website, combined with a database of people catalogued by whether they are Romani, lends enough credence to plaintiff's view to present a question of fact as to discriminatory effect.

The same can be said of discriminatory purpose. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266, 97 S. Ct. 555, 564 (1977). Plaintiff has pointed to language published on NABI's website that includes pejorative generalizations about Romani people, not just individuals accused or found guilty of crime. *See* pp. 5–6, *supra*. A fact finder could find in such language a basis to conclude that NABI's actions were motivated by a discriminatory purpose. *See Carrasca*, 313 F.3d 828, 834 (noting that question of fact existed as to whether defendant Park Ranger "acted with a racially discriminatory purpose" when he referred to plaintiffs as 'Mexicans', "arguably stated as a pejorative racial slur"); *see also Mody v. City of Hoboken,* 959 F.2d 461, 467 (3d Cir. 1992) (noting that a racial slur by police officer may be proof of racially-motivated police conduct).

Even if defendants' motive was primarily to aid in the prosecution of criminal suspects, a finding of discriminatory intent does not require that the defendants' actions have possessed no legitimate purpose at all. *See Hassan,* 804 F.3d 277, 297. Rather, "[a]ll you need is that the state actor *meant* to single out a plaintiff because of the *protected characteristic* itself." *Id.* at 298 ("[I]ntentional discrimination need not be motivated by ill will, enmity, or hostility to contravene the Equal Protection Clause." (internal quotation and citation omitted)). The Third Circuit's holding, read onto the facts of this case, implies that "even if [the NABI members] were subjectively motivated by a legitimate law-enforcement purpose (no matter how sincere), they've intentionally discriminated if they wouldn't have [catalogued Demetro] had [he] not been [Romani]." *Id.* at 298. NABI thus goes astray in arguing that even if it

38

acted out of bias, the plaintiff "cannot show that this was unmerited." (*See* NABI Br. at 13.)

Whether defendants meant to single out Demetro for inclusion on their website because of his ethnic status presents a material question of fact that precludes summary judgment.

### iii. *Officer Pochek/Qualified Immunity*

Officer Pochek separately argues that he is entitled to qualified immunity from Demetro's equal protection claim because "he was reasonably acting in good faith in accordance with the law." (RP/W Br. at 18–19). "Qualified immunity is a doctrine that shields government officials from a suit for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Gormley v. Wood-El*, 218 N.J. 72, 113, 93 A.3d 344, 367 (2014) (internal quotation and citation omitted); *Ramos v. Flowers*, 429 N.J. Super. 13, 21, 56 A.3d 869, 874 (App. Div. 2012).

Equal protection under the law is a clearly established constitutional right. *See Joyce v. City of Sea Isle City*, No. 04-5345, 2008 WL 906266, at *16 (D.N.J. Mar. 31, 2008) (collecting cases). In this context, assuming *arguendo* that Pochek and NABI catalogued Demetro in NABI's database due to his Romani ethnicity, that would be a clear violation of equal protection that precludes qualified immunity. *See Grant v. City of Pittsburgh*, 98 F.3d 116, 121 (3d Cir. 1996) (noting that in the qualified immunity context "the question is whether a reasonable public official would know that his or her *specific conduct* violated clearly established rights.").

Because, as outlined above, critical questions of fact remain unresolved, it cannot be said at this stage whether Pochek's concerted action with NABI "violate[d] clearly established statutory or constitutional rights." *Wood-El*, 218 N.J. 72, 113; *Grant*, 98 F.3d 116, 122 (noting tension between the U.S. Supreme Court's "insistence that the immunity defense be decided as a matter of law" and "the reality...that factual issues must frequently be resolved in

order to determine whether the defendant violated clearly established federal law"). Even if accompanied by good faith reasons, discriminatory intent—which remains a material question of fact—may support a claim that plaintiff's equal protection rights were violated. *See Hassan*, 804 F.3d 277, 297. For example, even if defendants' narrow motive was the desire to aid law enforcement, an intent to specifically target persons of a particular race or ethnicity may support a finding of a constitutional violation. *See United States v. Armstrong*, 517 U.S. 456, 464, 116 S. Ct. 1480, 1486 (1996) (noting that equal protection demands that "the decision whether to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification" (internal quotation and citation omitted)). And Pochek's subjective belief that he was not violating Demetro's constitutional rights "is simply irrelevant to [the qualified immunity] analysis." *Grant*, 98 F.3d 116, 123 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 815, 102 S. Ct. 2727, 2736 (1982)).

Additionally, qualified immunity only protects "official action" by government officials. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987) (noting that qualified immunity only protects "reasonable official action"). The extent to which Pochek was acting in his official capacity as a law enforcement officer (as opposed to his private capacity as a NABI member and officer) raises a question of fact, just as NABI's status as a state actor raises questions of fact.[22]

Consequently, Pochek's qualified immunity depends on the resolution of issues of fact, and cannot be determined at this time.

---

[22]     Again, these determinations are somewhat in tension. *See* n.18, *supra*. Pochek wants to be given qualified immunity because his acts were assertedly performed in his official capacity, but NABI at the same time distances itself from the state in order to avoid being deemed a state actor.

### D. Civil Conspiracy under 42 U.S.C. § 1985 and NJLAD (Count 7)

In Count 7, Demetro alleges that NABI, Pochek and unknown individuals conspired to violate Demetro's equal protection rights on account of his race or ethnicity, in violation of 42 U.S.C. § 1985(3) and the NJCRA.

To make out a violation of § 1985(3) a plaintiff must prove the following four elements: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 828–29, 103 S. Ct. 3352, 3356 (1983).

Demetro has put forward enough of a factual basis to plausibly support the elements of an agreement and concerted action. "Civil rights conspiracies brought under Section 1983 and the NJCRA require a 'meeting of the minds,' and to survive a motion to dismiss, a plaintiff must provide some factual basis to support the existence of the elements of a conspiracy, namely, agreement and concerted action." *Obataiye v. Lanigan*, No. 14-5462 (FLW), 2016 WL 5387626, at *6 (D.N.J. Sept. 26, 2016) (citing *Startzell v. City of Philadelphia*, 533 F.3d 183, 205 (3d Cir. 2008)). There is no dispute that NABI is an organization of individuals who agree to coordinate NABI's database of suspected transient criminals.

There is enough evidence of a purpose to deprive the plaintiff of the equal protection of the laws to repel the defendants' summary judgment motion. The same issues of fact that bar summary judgment as to the § 1983 equal protection claims, *see* Subsection III.B., *supra*, also bar summary judgment as to the claim of conspiracy to violate equal protection. *See Mody*, 959 F.2d 461, 466 (recognizing that viability of § 1985(3) claim turned on success of corresponding § 1983 claim); *Cherrits v. Vill. of Ridgewood*, 311 N.J. Super. 517, 535, 710 A.2d 586, 595 (App. Div. 1998) (same); *see generally Griffin v.*

*Breckenridge,* 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798–99 (1971) (noting that section 1985(3) requires proof that conspirators sought to deprive a person of equal protection of the laws).

Consequently, I will deny defendants' motion for summary judgment on Count 7.

## IV.   CONCLUSION

For the foregoing reasons, I will grant in part and deny in part defendants' motions for summary judgment in accordance with this Opinion.

An appropriate Order follows.

Dated: June 25, 2019

HON. KEVIN MCNULTY, U.S.D.J.